AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original    ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

**9/3/25**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MRV _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

09/03/2025

**CENTRAL DISTRICT OF CALIFORNIA**
BY: _____ jm _____ DEPUTY

United States of America

v.

CHASE GRIFFIN,
  aka "Trey Primo,"

                    Defendant(s)

Case No.  2:25-mj-05427-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

As described in the accompanying attachment, defendant violated the following statutes:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 1344, 1349, 1028A | Conspiracy to Commit Bank Fraud, Aggravated Identity Theft |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

/s *Marcus Updegraff*
*Complainant's signature*

Marcus Updegraff, Postal Inspector
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:        9/3/2025 at 1:29 pm

*Judge's signature*

City and state:   Los Angeles, California

Hon. Michael B. Kaufman, U.S. Magistrate Judge
*Printed name and title*

AUSA Andrew Brown, 11th Floor, x0102

**Complaint Attachment**

Count One, 18 U.S.C. § 1349

Beginning in or before 2022, and continuing through at least September 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant CHASE GRIFFIN, aka "Trey Primo," conspired with others to commit bank fraud, in violation of Title 18, United States Code, Section 1344.  The object of the conspiracy was carried out, and to be carried out, in substance, as follows:  Defendant GRIFFIN and his co-conspirators would steal checks from the mail, often for tens of thousands of dollars.  Defendant GRIFFIN would recruit bank account holders online through social media, such as Instagram, by posting photographs of himself holding stacks of currency over a foot high.  Defendant GRIFFIN would advertise for holders of various bank accounts to give him access to their accounts.  Defendant GRIFFIN and his co-conspirators would then deposit the stolen and altered checks into the bank account holders' accounts, then race to withdraw the funds before the bank detected the fraud.  Federally insured financial institutions defrauded as a result of this conspiracy include Citibank, Wells Fargo Bank, City National Bank, and JP Morgan Chase Bank.

Count Two, 18 U.S.C. § 1028A(a)(1)

Beginning in or before 2022, and continuing through at least September 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant CHASE GRIFFIN, aka "Trey Primo," knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person during and in relation to a felony violation of Title 18, United States Code, Section 1349, Conspiracy to Commit Bank Fraud, as charged in Count One, knowing that the means of identification belonged to another actual person.

<u>**AFFIDAVIT**</u>

I, Marcus Updegraff, being duly sworn, declare and state as follows:

I.  <u>**INTRODUCTION**</u>

1.    I am a U.S. Postal Inspector with the United States Postal Inspection Service ("USPIS") and have been so employed since May 2023.  Before joining USPIS, I was a special agent with the U.S. Naval Criminal Investigative Service ("NCIS") for 17 years.  I have completed the 12-week Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, GA, and advanced training with NCIS, as well as the USPIS Agent to Inspector Training Program in Potomac, MD.  I also completed the Mail Theft Training Course at the Southwest Training Center in Fort Worth, TX, and the Federal Bureau of Investigation Basic Cell Site Analysis Course.

2.    I am currently assigned to the Pasadena Mail Theft Team, where my responsibilities include the investigation of crimes against the United States Postal Service ("USPS") and crimes related to the misuse and attack of the mail system, including theft of U.S. mail, possession of stolen mail, and crimes related to the use, theft, or counterfeiting of postal keys and locks.  I also investigate crimes in connection with access devices including credit cards and debit cards; stolen, counterfeit, or otherwise fraudulent checks; identity theft; and the unauthorized use of other persons' information for financial gain, as these criminal schemes are often perpetrated through the U.S. mail.

3.    Through my investigations, my training and experience, and discussions with other law enforcement personnel, I have become familiar with the tactics and methods employed by those who conduct

mail theft, bank fraud schemes using stolen and/or counterfeit checks, identity theft, and access device fraud.  These methods include but are not limited to: the use of wireless communications technology, such as cellular telephones and prepaid cellular accounts; social media; counter surveillance; false or fictitious identities; and coded or vague communications in an attempt to avoid detection by law enforcement.

## II. PURPOSE OF AFFIDAVIT

4.   This affidavit is made in support of a criminal complaint and application for arrest warrant against CHASE GRIFFIN, aka "Trey Primo," for violations of 18 U.S.C. §§ 1344, 1349, 1028A, (Conspiracy to Commit Bank Fraud, and Aggravated Identity Theft).

5.   This affidavit is also made in support of an application for search warrants for the following:

a.   The person of CHASE GRIFFIN ("GRIFFIN"), as described more fully in Attachment A-1;

b.   The person of ISHMAEL SANCHEZ ("SANCHEZ"), as described more fully in Attachment A-2;

c.   12509 Saddle Court, Porter Ranch, CA 91326 ("**Porter Ranch House**"), as described more fully in Attachment A-3;

d.   626 N. Azusa Avenue, Apartment 444, Azusa, CA 91702 ("**Azusa Apartment**"), as described more fully in Attachment A-4;

e.   The grey 2022 BMW X6M Competition bearing CA Temporary License Plate CX07F62 and VIN 5YMCY0C06N9M75163 ("**SANCHEZ' BMW**"), as described more fully in Attachment A-5;

f.   The grey 2020 Mercedes Benz AMG GT bearing TX Temporary License plate 8045D59 and VIN WDD7X8KBXLA011003 ("**SANCHEZ' Mercedes**"), as described more fully in Attachment A-6.

2

6.    As described more fully below, I respectfully submit there is probable cause to believe the requested search warrants will yield evidence of violations of 18 U.S.C. §§ 1344, 1349, 1028A, 1708, and 1956 (Conspiracy to Commit Bank Fraud, Aggravated Identity Theft, Possession of Stolen Mail, and Money Laundering) (the "Subject Offenses"), that are being committed by GRIFFIN, SANCHEZ (the "Target Subjects"), and others, known and unknown.

7.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of, or investigation into, this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

8.    GRIFFIN, SANCHEZ, and their conspirators obtain checks stolen from the mail, then alter them or create counterfeit versions so they appear to be payable to their accomplices.  GRIFFIN recruits these accomplices online, often through Instagram, in which he posts photographs of himself holding stacks of currency that can be well over a foot high.  He advertises for holders of various bank accounts to give him access to their accounts.  After he recruits an accomplice, GRIFFIN and his co-conspirators deposit these fraudulent checks, which are typically for tens of thousands of dollars, into

the accomplice's account, then race to withdraw the funds before the bank detects the fraud.

9.    In late 2023, GRIFFIN deposited three fraudulently negotiated checks totaling $199,097.27 into a JPMorgan Chase account belonging to a cooperating witness.  The witness, who knew the subject only as "Trey," provided information which assisted in identifying GRIFFIN, to include the phone number he/she communicated with, and text messages exchanged with him.  Within the text messages was a photo sent to the witness with GRIFFIN's tattooed hand holding a receipt for an ATM deposit of a check in the amount of $22,487.29 and the witness' JPMorgan Chase debit card.  GRIFFIN subsequently directed the witness to coordinate with a co-conspirator named "DB" in order to make cash withdrawals of the illicit funds.  The witness was able to identify "DB" as SANCHEZ in a photo line-up based on his/her in-person meetings with him.

10.    Following the deposit of a second fraudulent check into the witness' account, this time in the amount of $71,143.73, numerous transactions occurred totaling approximately $69,413.  This activity appeared to be intended to rapidly remove illicit funds from the account.  Many of the transactions occurred at Yaamava' Casino at San Manuel in Highland, CA, where GRIFFIN asked the cooperating witness to meet him.  The witness was unable to go to the casino, but subsequently met GRIFFIN in Ontario, CA.  The witness was able to identify "Trey" as GRIFFIN in a photo line-up based on his/her in-person meetings with him.

11.    Reviews of public social media profiles on the Instagram application revealed two accounts belonging to GRIFFIN; Treytimes3 and Treytimes3_.  Among the public posts on both accounts were

4

numerous photos of GRIFFIN displaying large amounts of cash, guns, as well as photos of GRIFFIN in front of ATMs or holding ATM receipts. In one post, dated May 11, 2022, GRIFFIN can be seen sitting on top of an open USPS cluster box unit (CBU).[1] In a post dated October 16, 2023, another Instagram user left a comment which read, "Bitch boy check yo dm I got a wells," in an apparent reference to having solicited someone to use their Wells Fargo bank account for a similar fraud scheme. Additionally, stories posted by Treytimes3_ which were publicly visible on August 30, 2024 included photos of ATM check deposit receipts in large amounts, and a photo of GRIFFIN with the text, "If you don't put a Chase in my hand by 4pm today you're literally an idiot," in an apparent request for a JPMorgan Chase accountholder to respond.

12. JPMorgan Chase provided me with relevant records pertaining to the ATM check deposit receipts posted on GRIFFIN's Instagram stories. Two accountholders, M.A. and J.P., were identified as having had fraudulent checks deposited into their accounts on August 29, 2024, in the amounts of $49,931.90 and $111,892.80, respectively. JPMorgan Chase records and video footage further revealed that, on August 30, 2024, M.A. withdrew $45,000 in cash from JPMorgan Chase branches in Chino, CA, and Fontana, CA. The same day, J.P. withdrew a total of $100,000 in cash and a

---

[1] A CBU contains numerous individual mailboxes belonging to different residences and only USPS personnel are authorized to open the entire units, however, mail thieves frequently use counterfeit mail keys, stolen mail keys, or pry tools to open CBUs for the purpose of stealing checks, identification documents, credit cards, or personally identifiable information from the mail.

cashier's check from three different JPMorgan Chase branches, including the same bank branches in Chino and Fontana used by M.A..

13.  On January 22, 2025, I interviewed J.P..  J.P. stated his brother put him in contact with another co-conspirator named John MEJIA ("MEJIA"), who recruited him to participate in the scheme. J.P. confirmed he provided MEJIA with his debit card and PIN, and met with MEJIA on August 30, 2024 to withdraw funds from a fraudulent check deposit.  J.P. also identified SANCHEZ in a photo lineup as having been present, and said he provided the illicit funds directly to SANCHEZ.

14.  On February 5, 2025, M.A admitted to his participation in the scheme and said he was recruited by an individual using the Instagram moniker f80__checks.  M.A.'s phone was searched pursuant to a federal search warrant and revealed he had contact with MEJIA's Telephone on August 29, 2024.  M.A. also identified SANCHEZ in a photo lineup as having been present on August 30, 2024 when M.A. made withdrawals of illicit funds.

15.  On October 4, 2024, GRIFFIN was arrested by Atlanta Police Department during a traffic stop after officers confirmed he had multiple outstanding warrants for arrest within the State of Georgia.  GRIFFIN remained in the custody of various county jails until his release on July 13, 2025.  Immediately upon his release, the Treytimes3_ Instagram page became active again, posting stories soliciting bank accountholders to participate in the check fraud scheme.  On August 28, 2025, Treytimes3_ posted additional solicitations for accountholders from various banks and marked the location of the post as Los Angeles, CA.  The same day the account

posted, "Someone tell DB it's ok not to drive 150mph everywhere" indicating he was with SANCHEZ in the Los Angeles area.

## IV. <u>PREVIOUS SEARCH WARRANTS</u>

16.  I previously obtained a few federal warrants in this case, some of which are mentioned below.  On August 18, 2025, the Honorable Michael B. Kaufman issued a search warrant for the smartphone of GRIFFIN, which had been seized from him by law enforcement during an earlier arrest, 2:25-MJ-5061.  Computer forensics for this smartphone are not yet available, however.

## V. <u>STATEMENT OF PROBABLE CAUSE</u>

17.  Based on my training and experience, my personal involvement in this investigation, conversations with other law enforcement officers and postal inspectors, and review of reports and surveillance videos, I know the following facts:

**A.    Checks Stolen from US Mail Reported to Los Angeles Police Department**

18.  On December 11, 2023, a representative of Sol's Brake Supply, a business located in North Hollywood, CA, visited the Foothill Division Station of the Los Angeles Police Department ("LAPD"), and reported the business mailed out three checks from a USPS collection box in Tarzana, CA, intended for various suppliers. However, the checks were stolen then deposited into JPMorgan Chase accounts not belonging to the intended recipients.  The Sol's Brake Supply representative provided images of the checks that had been deposited and confirmed the listed payee on each check had been changed from the intended recipient.

19.    The LAPD Commercial Crimes Division obtained records from JPMorgan Chase Bank pertaining to the three accounts where the fraudulent checks were deposited.  According to the records provided, two of the checks, one in the amount of $8,657.70, and the other in the amount of $71,143.73, were deposited at a Chase Bank ATM located at 31 W. Foothill Blvd, Upland, CA, on November 11, 2023.  The third check, in the amount of $4,689.54, was deposited remotely on or about November 15, 2023.

20.    A review of the account which received the $71,143.73 deposit revealed a prior deposit of $22,487.29 made on October 26, 2023.  This deposit was also made at an ATM located at 31 W. Foothill Blvd, Upland, CA.  Information was provided by City National Bank, whose business customer, DC Logistics, issued a check intended for payee Baker Tilly US, LLP in the amount of $22,487.29. However, this check, along with another in the amount of $29,081.74, was stolen and used to create counterfeit checks with the same date, check number, and amount as the original, but with different payees.

21.    Further review of the bank statements pertaining to the Chase account which received the deposits of $22,487.29 and $71,143.73 revealed two cash withdrawals made on November 4, 2023 (one week after the $22,487.29 deposit was made) totaling $18,500, as well as an ATM withdrawal of $800.  Additionally, two CashApp payments were sent the same day totaling $2,600, and a plane ticket was purchased on Delta Airlines in the amount of $598.90.  This activity appeared to be intended to remove all of the illicit funds from the account.

22.    Following the $71,143.73 deposit on November 11, 2023, numerous transactions occurred on November 14 and 15, 2023, to

8

include card purchases at Yaamava' Casino at San Manuel in Highland, CA totaling $43,533; ATM withdrawals totaling $8,000; Zelle payments totaling $12,980; and CashApp payments totaling $4,900.  This activity also appeared to be intended to rapidly remove illicit funds from the account.[2]

23.  A third large deposit, in the amount of $105,466.25, was made into the same account on November 15, 2023, again at an ATM located at 31 W. Foothill Blvd, Upland, CA.  This check was returned as altered/fictitious and the account was subsequently closed.

24.  On January 18, 2024, the LAPD Commercial Crimes Division referred the case to me.

**B.    Interview of Cooperating Witness**

25.  A cooperating witness was interviewed and stated they were contacted by Instagram user 4800_trench circa October 2023.  The witness stated they subsequently met in person with someone calling himself "Isaac."  Isaac told the witness he/she could make money by giving him a debit card and personal identification number (PIN) so his friend could make deposits into the witness' account.  The witness provided Isaac his/her debit card and PIN and he/she was subsequently contacted via text message by a man who called himself "Trey" ("Trey" was later identified as GRIFFIN, as described below, and will be referred to hereafter as GRIFFIN for clarity).  On October 26, 2023, GRIFFIN sent the witness a photo of the debit card he/she had given to Isaac, along with GRIFFIN's tattooed hand

---

[2] This type of scheme is known within the banking and law enforcement communities as "card cracking." Card cracking is a form of fraud where accountholders respond to an online solicitation for "easy money" and provide a debit card for withdrawal of fake check deposits.

holding an ATM receipt for a deposit in the amount of $22,487.29. The receipt included the last four digits of the witness's account number and indicated the funds would become available on November 4, 2023 (see image below).

26.  GRIFFIN told the witness he was in Atlanta, GA and could not meet with him/her in person to withdraw the funds as soon as they became available, so he directed the witness to coordinate with his associate "DB" regarding how and when to withdraw the funds from the bank ("DB" was later identified as SANCHEZ, as described below, and will be referred to hereafter as SANCHEZ for clarity).  On November 4, 2023, the witness met with SANCHEZ and they visited two Chase Bank branches where the witness withdrew a total of $18,500 in cash and provided it to SANCHEZ.

27.  GRIFFIN used the witness' debit card to purchase a plane ticket from Atlanta to Los Angeles that same day and told the witness he would be arriving at Los Angeles International Airport ("LAX") in the early morning hours of November 5, 2023.  The witness agreed to pick him up from the airport, at which point he/she met GRIFFIN in person for the first time.  The witness stated he/she took GRIFFIN to downtown Los Angeles where they met with SANCHEZ and other unknown individuals to eat and socialize before the witness departed.

28.  On November 13, 2023, GRIFFIN contacted the witness and told them to check their bank account.  The witness stated he/she logged in online and saw a $71,143.73 deposit.  The witness told GRIFFIN he/she was not comfortable with such a large deposit, but GRIFFIN responded by saying it was fine and that he had previously made deposits in people's accounts up to $200,000 without

repercussions.  GRIFFIN further told the witness that banks were federally insured up to $250,000, so they would be reimbursed by the federal government for any losses.

29.  On the morning of November 14, 2023, GRIFFIN contacted the witness and told him/her to come to Yaamava' Casino as soon as possible to facilitate withdrawing or transferring the money out of the witness' account.  The witness told GRIFFIN he/she had to work and could not leave until later that day.  GRIFFIN told the witness they were going to start "swiping," in an apparent reference to using the witness' debit card for numerous transactions at the casino.  When the witness notified GRIFFIN he/she was leaving his/her job, GRIFFIN told him/her to pick GRIFFIN up from an address in Ontario, CA.  The witness provided me with screenshots of his/her text message communications with GRIFFIN corroborating the witness' account.

30.  The witness met GRIFFIN on the afternoon of November 14, 2023.  According to the witness, GRIFFIN explained he primarily resided in Atlanta, where he had a child, but, while in California, he lodged with associates at either 451 E. 47th Street, Los Angeles, CA or at a residence in Ontario.  The witness also recalled GRIFFIN saying he was aware there were warrants for his arrest in Georgia.

31.  While together, GRIFFIN used the witness' phone to log into the witness' Chase account in an attempt to wire transfer money out of the account, but was unsuccessful.  According to the witness, GRIFFIN became frustrated and annoyed, saying there was a time constraint and they needed to get the money out of the account quickly.  GRIFFIN told the witness he and his associates would continue to pull money out by swiping, but also asked the witness to

11

send money from the account using Zelle and CashApp, to include sending money to GRIFFIN's mother at CashApp account $3xzMomma.

32. The witness noted that GRIFFIN and some of his associates carried large stacks of cash whenever the witness saw them, estimating the stacks to be $20,000 each. The witness further stated GRIFFIN also once showed him/her approximately ten debit cards belonging to different people which GRIFFIN said he was currently using to deposit checks.

33. According to the witness, another deposit was attempted into his/her account in the amount of $105,466.25 on or about November 15, 2023, but the funds never became available and the account was subsequently restricted, then closed by the bank. The witness attempted to contact GRIFFIN numerous times after that point, but GRIFFIN did not respond.

### C.    Identification of GRIFFIN and SANCHEZ

34. Following the interview of the cooperating witness on February 1, 2024, I queried the phone number he/she provided for "Trey," 727-603-3747, in a law enforcement database, which indicated it was used by GRIFFIN. Records provided by Tracfone later revealed the subscriber name associated with the phone number was "Trey Primo." Delta Airlines records also identified GRIFFIN as the passenger for the ticket purchased with the witness' debit card, and the same phone number was listed as the contact phone number for the passenger. Additional queries of GRIFFIN in law enforcement databases revealed a current or previous address of 2814 E. Agrarian St, Ontario, CA 91762, which is consistent with the witness' account that GRIFFIN said he stayed in Ontario when in the greater Los Angeles area, as well as arrest warrants for GRIFFIN in Conyers, GA;

Fayetteville, GA; Decatur, GA; and Newark, NJ.  On February 9, 2024, the cooperating witness identified GRIFFIN in a photo line-up of six similar-looking persons as the person he/she knew as "Trey."

35.  On November 27, 2024, I met with Investigator Curtis Clesceri, Upland Police Department ("UPD"), to discuss the case. Clesceri informed me he had queried the phone number provided for "DB" in an internal UPD database and found that UPD had responded to a domestic disturbance at 1303 E. 9th Street, Apt 9, Upland, CA on June 6, 2023, and made contact with SANCHEZ.  During their field interview of SANCHEZ, SANCHEZ provided his cellular phone number. The phone number provided by SANCHEZ was the same as was provided for "DB" by the cooperating witness.  On December 5, 2024, the cooperating witness identified SANCHEZ in a photo line-up of six similar-looking persons as the person he/she knew as "DB."

36.  Call detail records provided by the Carrier for GRIFFIN's phone number, 727-603-3747, were reviewed and revealed numerous calls exchanged between GRIFFIN and the cooperating witness between October 25, 2023 and November 15, 2023.  The records also revealed numerous calls exchanged between GRIFFIN and the phone number provided for SANCHEZ, 213-407-6513, during the period of October 4, 2023 through December 19, 2023.

**D.   Review of GRIFFIN's Social Media**

37.  Following the identification of GRIFFIN, two public Instagram social media accounts were found which pertained to GRIFFIN and his activities: treytimes3 and treytimes3_.  Both accounts included photos of GRIFFIN where a tattoo on his right hand is visible and matched the tattoo on the hand in the photo sent to the cooperating witness.

13

38.  The treytimes3 account included multiple photos where GRIFFIN can be seen displaying large amounts of cash.  Other photos included GRIFFIN holding Wells Fargo money envelopes and GRIFFIN standing in front of a Wells Fargo ATM.  In one post, dated May 11, 2022, GRIFFIN can be seen sitting on top of an open USPS CBU.

39.  Another post, dated January 2, 2023, shows GRIFFIN in the Granite City Boxing Gym located in Ellenwood, GA (approximately 17 miles from central Atlanta), corroborating the cooperating witness' reporting that GRIFFIN was from Atlanta.

40.  The treytimes3_ account included some of the same photos as the treytimes3 account, and also contained multiple photos of GRIFFIN displaying large amounts of cash, to include posts dated December 5, 2023 and December 19, 2023.

41.  A post dated October 16, 2023 appears to have been taken in front of the residence located at 2814 E. Agrarian St, Ontario, CA 91762, and another Instagram user, livinglikeshay, left a comment on the post which read, "Bitch boy check yo dm I got a wells," in an apparent reference to having solicited someone to use their Wells Fargo bank account for a similar fraud scheme.  Another post, dated January 15, 2024, listed the location of the photo as Gilbert Lindsay Park, which is the name of a park in Los Angeles, CA less than one mile from 451 E. 47th Street, Los Angeles, CA, where GRIFFIN told the cooperating witness he sometimes resided.

42.  On August 29, 2024, stories were posted on the treytimes3_ account which included photos of ATM check deposit receipts and Chase debit cards with the cardholders' names concealed.  One such Instagram story included a receipt for a check deposit in the amount of $239,282.80 and indicated the funds would become available on

14

August 30, 2024.  Although the name on the debit card was concealed, some letters were readable and the name appeared to be Jennifer Solano.  A second story included a receipt for a check deposit in the amount of $37,833.76 and also indicated the funds would become available on August 30, 2024.  Although the name on the debit card was concealed, some letters were readable and the last name appeared to be Mendoza.  The sequence of stories also included a photo of GRIFFIN with text which read, "If you don't put a Chase in my hand by 4pm today you're literally an idiot".

43.  A profile with the username @treytimes3_ was also located on the social media platform X (formerly known as Twitter).  A post dated March 16, 2024 stated, "Jus let me Get a chase," in an apparent reference to a Chase bank account.  Additionally, a post dated November 19, 2023 included a video of GRIFFIN where he stated he has "thirty-something plays, I'm trying to get to everybody when I can, just stop rushing. That shit's weird. Like, who else you know popping on twenty, thirty 'k' next day? Just chill."[3]

**E.    The Bank Accounts of J.P. and M.A. were Used to Receive and Disburse Stolen Check Proceeds**

44.  I contacted JPMorgan Chase Bank to obtain additional information regarding the deposits posted on the treytimes3_ Instagram page on August 29, 2024 and learned that both checks were deposited on August 29, 2024 at an ATM in Chino Hills, CA to accounts belonging to Jennifer Solano of Sylmar, CA and Kayla

---

[3] A "play" in criminal parlance typically refers to a pre-planned, illegal money-making activity. Those involved in card cracking schemes often also refer to their recruited accountholders as "plays" or "heads."

Mendoza of Bakersfield, CA.  I also learned that two additional fraudulent checks were deposited at the same ATM during the same timeframe, one in the amount of $111,892.80 to an account belonging to J.P., and the other in the amount of $49,931.90 to an account belonging to M.A..

45.  JPMorgan Chase provided bank statements for the accounts where the checks were deposited on August 29 as well as signature cards for the accountholders.  The checks deposited into Solano's and Mendoza's accounts were returned as altered/fictitious and the funds did not appear to have become available for withdrawal.  However, bank statements for J.P.'s and M.A's accounts showed that, on August 30, 2024, J.P. withdrew $100,000 in illicit funds, and, on the same day, M.A. withdrew $45,000 in illicit funds.  The checks deposited were returned as altered/fictitious a few days later, and the accounts were closed with significant negative balances.

46.  On December 2, 2024, I made contact with Melissa Arian of Echo Entertainment, Inc. in Calabasas, CA.  Arian confirmed that check #8596, in the amount of $49,931.90, was issued by her company and mailed to the intended payee, Fully Armed Productions, Inc., 613 Wichita Srive, Lexington, KY 40503, on August 20, 2024.  However, the check was never received by the intended recipient, and when she saw an image of the check which had been negotiated, she saw the payee had been fraudulently changed to M.A..

47.  Video footage of several large cash withdrawals from the accounts belonging to J.P. and M.A. were provided by JPMorgan Chase.  M.A. made his first withdrawal from a branch located at 7033 Schaffer Ave, Chino, CA at approximately 10:15 a.m. on August 30, 2024.  M.A. then made a second withdrawal from a branch located at

16

16897 Sierra Lakes Pkwy, Fontana, CA at approximately 12:30 p.m. on August 30, 2024.  J.P. made a withdrawal from the same branch located at 16897 Sierra Lakes Pkwy, Fontana, CA at approximately 1:00 p.m. on August 30, 2024.  Both Chino and Fontana are in the Inland Empire area of greater Los Angeles where GRIFFIN, SANCHEZ, and their associates are known to operate their check fraud scheme.

48.  On January 22, 2025, I interviewed J.P. who immediately acknowledged his participation in the check fraud scheme.  J.P. stated he provided his debit card and PIN to John MEJIA, as well as his login credentials to his online JPMorgan Chase account, and his driver's license.

49.  J.P. recalled being notified that a "drop" was done, meaning a check had been deposited in his account, and need would need to meet with MEJIA in order to withdraw the money.  J.P. stated that, on August 30, 2024, he and his brother drove to the Inland Empire to meet with MEJIA.  According to J.P., another collusive accountholder met them as well, who he described as a man in his early 20s, possibly Filipino (J.P.'s description matched that of M.A.).  J.P. stated he, his brother, and M.A. got into MEJIA's Tesla and rode with him a short distance to a Chase Bank branch.  In the bank parking lot, they met with another group of four individuals in a black Mercedes.  J.P. stated the group included three black males, and one Hispanic male who seemed to be coordinating everything.

50.  I showed J.P. a photo lineup containing six similar looking individuals which included SANCHEZ.  J.P. quickly identified SANCHEZ as the Hispanic male in the Mercedes, and J.P.'s brother subsequently provided me the phone number he had used to communicate with SANCHEZ.

17

51.   J.P. stated SANCHEZ and MEJIA gave him and M.A. instructions on what to say to the bank teller and how much money to withdraw.  J.P. stated he was told the check deposited into his account came from a trucking company, so he was told to say he was withdrawing money to purchase a truck if asked by a bank employee. According to J.P., M.A. went in first and withdrew approximately $20,000.  J.P. stated that, after M.A. came out, J.P. was directed to go in and withdraw $40,000.  J.P. stated he entered the bank by himself and was able to conduct the withdrawal, then exited and provided the full amount to SANCHEZ.

52.   J.P. stated he got back into MEJIA's Tesla with his brother, MEJIA, and M.A., and they followed the black Mercedes to another Chase Bank branch, where they repeated the process.  J.P. stated M.A. again went in first to conduct his withdrawal, returning with additional cash.  J.P. stated he was told by MEJIA and SANCHEZ to ask for a combination of cash and a cashier's check made out to J.P's brother.  J.P. stated he again provided all the cash to SANCHEZ.

53.   On February 5, 2025, M.A. was interviewed and admitted to his participation in the scheme as well.  According to M.A., he was recruited by MEJIA on August 29, 2024 while at a car meet in Corona, CA.  M.A.'s phone was searched pursuant to a federal search warrant and revealed he received a text message from MEJIA at 8:35 p.m. on August 29, 2024 which read, "We gonna need you ready tomorrow up at 8am sending screenshot."

54.   M.A. stated he met MEJIA on August 30, 2024 and confirmed he rode in MEJIA's Tesla to two separate Chase Bank branches where he withdrew approximately $45,000 cash at MEJIA's direction.

18

According to M.A., he provided the illicit funds to MEJIA and was paid $4,000 for his participation in the scheme. M.A. also identified SANCHEZ in a photo lineup as having been present on August 30, 2024 when M.A. made withdrawals of illicit funds.

**F.    Review of Historical Phone Location Data**

55.   On March 23, 2025, the Honorable Joel Richlin, U.S. Magistrate Judge, Central District of California, issued a search warrant for historical and prospective location data for GRIFFIN's Previous Telephone: 213-407-1596, SANCHEZ' Previous Telephone: 213-410-6532, and John MEJIA's Telephone: 714-353-4235. Review of historical location data corroborated the details provided by J.P. and M.A. regarding the withdrawals made on August 30, 2024 by showing that MEJIA's Telephone and SANCHEZ' Previous Telephone were in the area of the JP Morgan Chase bank branches from where the withdrawals were made in Chino, CA and Fontana, CA, at the times the withdrawals were made. Review of call detail records also showed multiple calls exchanged between SANCHEZ' Previous Phone and MEJIA's Telephone on August 30, 2024, indicating they coordinated with one another to facilitate the withdrawal of illicit funds on that date.

**G.    GRIFFIN and Jajuan YOUNG Make Fraudulent Deposit on September 6, 2024**

56.   On September 6, 2024, a story was posted on the treytimes3_ account which showed a receipt from a $12,848.99 check deposit made at SchoolsFirst Federal Credit Union ("FCU") in Inglewood, CA. SchoolsFirst FCU provided statements for the account which received the deposit, belonging to Andrea Hagan of Bakersfield, CA. SchoolsFirst FCU also provided video footage of the deposit being made at an ATM and GRIFFIN can be seen exiting a

vehicle with one of his associates, Jajuan YOUNG, a resident of 451 E. 47th Street, Los Angeles, CA.  YOUNG approaches the ATM and conducts the deposit while GRIFFIN walks out of view.  Following completion of the transaction, YOUNG can be seen showing GRIFFIN the deposit receipt before they both return to their vehicle to depart.

**H.    Arrest of GRIFFIN in Atlanta, GA**

57.  On October 4, 2024, GRIFFIN was arrested by Atlanta Police Department during a traffic stop after officers confirmed he had four outstanding warrants for arrest from four different counties within the State of Georgia (APD Case #242772369).  GRIFFIN remained in the custody of various county jails until his release on July 13, 2025.  GRIFFIN spent the majority of that time in the Rockdale County Jail (November 27, 2024 until July 13, 2025) for violating his probation.  GRIFFIN currently remains on probation in Rockdale County, GA based on a 2019 felony conviction for violation of the Street Gang Terrorism and Prevention Act (Georgia Code 16-15), Docket #2019-CR-1162M.

58.  On July 16, 2025, after learning of GRIFFIN's release, I reviewed the Treytimes3_ public Instagram page and viewed stories posted by GRIFFIN.  In one story, GRIFFIN posted a photo from the inside of a Rolls Royce automobile with the text, "Every Chase in la call me rn Next day 20-90k." Another story included the text, "Who got a chase for me rn? Next day 30k." A third story included a photo of GRIFFIN with his forehead tattoo clearly visible.

59.  On July 16, 2025, GRIFFIN was arrested again during a traffic stop by Rockdale County Sheriff's Office in Conyers, GA (RCSO Case #2594888) when approximately 303 grams of marijuana, a scale, and a firearm were found in the vehicle where GRIFFIN was a

passenger.  RSCO arrested the driver of the vehicle and GRIFFIN for violations of Geogia Code 16-13-30 (Possession of Marijuana with Intent to Distribute), 16-13-30 (Possession of a Schedule II Controlled Substance), and 16-13-32.2 (Possession of Drug Related Objects).  The case against GRIFFIN was dismissed on July 31, 2025 and GRIFFIN was released.

## I.    Identification of Azusa Apartment, Porter Ranch House, SANCHEZ' BMW, and SANCHEZ' Mercedes

60.  On July 18, 2025, U.S. Magistrate Judge Joel Richlin, Central District of California, issued a search warrant for historical and prospective location data for SANCHEZ' telephone. Based on my review of the location data reported by the provider, I determined SANCHEZ' phone was overnighting near the intersection of Azusa Ave and Foothill Blvd in Azusa, CA, and identified an apartment building called The Orchard at 626 N. Azusa Ave, which contains the **Azusa Apartment**, as a possible residence for SANCHEZ.

61.  On July 24, 2025, I drove through the parking garage of The Orchard and located **SANCHEZ' BMW**.  I queried the license plate in the CA DMV database and confirmed it was registered to SANCHEZ. I was then able to conduct surveillance in the parking garage on July 29, 2025 and observed SANCHEZ exit **SANCHEZ' Mercedes**, which was parked immediately in front of **SANCHEZ' BMW** in the same **assigned parking space, #126**.  SANCHEZ entered the building's elevator and out of sight.  Conducting surveillance on foot within the building to identify the specific apartment SANCHEZ was occupying without being detected was not possible.

62.  I contacted the leasing office for The Orchard Apartments, but was told no information could be disclosed about building

21

residents without legal process directed to the property management company Greystar Properties, based in Charleston, SC.  On August 13, 2025, I received information from Greystar indicating the parking space being used by SANCHEZ corresponded to Apartment 444 (**Azusa Apartment**) in The Orchard.  But SANCHEZ' Telephone had not pinged at that location since August 12, 2025.  I also visited the parking garage and saw that both of SANCHEZ' vehicles were gone.

63.  On August 13, 2025, I showed an employee in the leasing office of The Orchard a photo of SANCHEZ and she confirmed she had seen him and other men entering and exiting **Azusa Apartment** on numerous occasions, though none of the men were listed as residents on the lease.  The employee stated she had not seen anyone access the **Azusa Apartment** in several days, and initially thought they had moved out.  But she had entered **Azusa Apartment** on August 12, 2025 to see if it had been vacated, and found furniture still inside.  As described in more detail later, SANCHEZ Telephone still pings in the area of the **Azusa Apartment**, but no longer overnights there, so it appears he maintains the **Azusa Apartment** for non-residential purposes, likely as a place from which to conduct his fraud.

64.  Since August 12, 2025, the location data for SANCHEZ' Telephone has placed the device in Canoga Park, Chatsworth, and Porter Ranch, CA. The device appears to be overnighting in Porter Ranch, but location accuracy given by the provider had been poor (typically over a 1500 meter accuracy radius), making it difficult to locate Sanchez' current residence.  However, on the morning of August 29, 2025, the location accuracy for the pings associated with SANCHEZ' device were within a 52 meter radius and showed the

location near the intersection of Saddle Ct and Ridgeline Rd in Porter Ranch, which is near the **Porter Ranch House.**

65.  Upon identification of a precise area to focus my search, on August 29, 2025, I drove on Saddle Ct and found **SANCHEZ' BMW** parked in the driveway of the **Porter Ranch House.**  That same day, I spoke to the USPS mail carrier whose route includes the **Porter Ranch House**, and they informed me they witnessed **SANCHEZ' BMW** depart the **Porter Ranch House** at approximately 11:15 a.m. that morning.  I reviewed the location data for SANCHEZ' telephone and found that, at 11:13 a.m., the device was in vicinity of the **Porter Ranch House**, but at 11:29 a.m. it was approximately 13 miles away.  This indicates SANCHEZ was likely in **SANCHEZ' BMW** when it departed at 11:15 a.m..

66.  The Redfin.com real estate website indicates the **Porter Ranch House** had been listed for rent for $15,800 per month, but the rental listing was removed on August 12, 2025, the same day SANCHEZ appears to have moved to Porter Ranch from Azusa.

67.  Additional reviews of SANCHEZ' location data revealed that SANCHEZ returned to the immediate vicinity of the **Azusa Apartment** on August 27, 2025 and August 29, 2025, indicating he still has access to the **Azusa Apartment.**  Based on my training and experience, I know those who conduct check fraud schemes professionally and successfully often attempt to distance themselves from some of the incriminating evidence by maintaining a "fraud office," or location separate from their actual domicile, where they make and store altered checks, access devices, identification documents, or items for which they will not need immediate access.

**J.    Continued Participation in the Fraud Scheme within the Central District of California by GRIFFIN and SANCHEZ**

68.    Following his release on July 31, 2025, GRIFFIN again began posting stories on the Treytimes3_ Instagram page soliciting bank accountholders or their recruiters to contact him. On August 5, 2025, a story read, "I need 30 citi banks" "I need 20 Chevys" "Next day" "25-50k" "Flood me rn w em don't miss yo beat" and the location was listed as Los Angeles, CA. Additional stories visible on August 18, 2025 and subsequent dates continued to solicit accountholders and listed the location as Los Angeles. On August 21, 2025, a story was posted to the Instagram page which read, "I need 4 wells for the morning 38k 78k 180k n 290k" "Head must be on point," and included a photo of the back of a BMW X6M Competition, the same rare make and model as **Sanchez' BMW.**

69.    On August 26, 2025, the @treytimes3_ account on X made a post indicating GRIFFIN was on his way to the airport. I reviewed location data for SANCHEZ' phone in accordance with the federal search warrant issued by the Honorable U.S. Magistrate Judge Joel Richlin on July 18, 2025, which revealed SANCHEZ' device was at LAX at 8:05 p.m. on August 26, 2025, likely picking up GRIFFIN. On August 28, 2025, the Treytimes3_ account posted a story which read, "Someone tell DB it's ok not to drive 150mph everywhere", and the @treytimes3_ account on X posted, "Why my homies drive like they want me to pass out in the whip from anxiety?"

70.    On August 31, 2025, the treytimes3_ Instagram account
posted a story which read, "Who need slips[4]" "New load in."  These
posts indicate GRIFFIN traveled from Atlanta to Los Angeles in order
to continue actively participating in the check fraud scheme with
SANCHEZ within the Central District of California.

**K.    GRIFFIN's Risk of Flight and Continued Criminal Activity**

71.    CHASE GRIFFIN has shown a long pattern of criminal
misconduct and avoidance of justice.  On December 16, 2019, GRIFFIN
received a 15-year sentence (six months in jail, six months on work
release, and the remainder to be served on probation) in Rockdale
County, GA after his felony conviction for violation of the Street
Gang Terrorism and Prevention Act (Georgia Code 16-15).  The terms
of his probation require that he "not violate the criminal laws of
any governmental unit and be of general good behavior," "Avoid
persons or places of disreputable or harmful character," and "not
possess or be in the presence of any firearms."  Since receiving
that sentence, GRIFFIN has been arrested multiple times for various
offenses:

a.    On September 26, 2020, GRIFFIN was arrested by
Snellville Police Department and subsequently convicted of a
misdemeanor charge of Driving with a Suspended License (Georgia Code
40-5-121) in Snellville, GA.

b.    On February 19, 2021, GRIFFIN was arrested by
Livingston Township Police Department in New Jersey and subsequently
indicted for felony charges of Resisting Arrest (New Jersey Statute

---

[4] Based on my training and experience, I know that "slips" is a
slang term for stolen checks.

2C:29-2), Obtaining by Fraud-Controlled Substance (NJ 2C:35-13), and
Conspiracy (NJ 2C:5-2).  GRIFFIN failed to appear for court
proceedings and a bench warrant was issued on October 7, 2022 (Essex
County Court Case #21001411).

     c.  On May 13, 2021, GRIFFIN was arrested by Atlanta
Police Department for a felony charge of Aggravated Assault with a
Deadly Weapon (GC 16-5-21), though GRIFFIN was not indicted and the
case was dismissed.

     d.  On July 8, 2021, GRIFFIN was arrested by Snellville
Police Department for a misdemeanor charge of Failure to Appear for
a Fingerprintable Offense (GC 17-6-12).

     e.  On October 4, 2024, GRIFFIN was arrested by Atlanta
Police Department for the misdemeanor charge of Driving with a
Suspended License (GC 40-5-121).  According to the police report, a
firearm was found in between the seats of the vehicle GRIFFIN was
driving, and GRIFFIN had four outstanding arrest warrants in
different jurisdictions.

     f.  On October 7, 2024, GRIFFIN was transferred to the
custody of the Dekalb County Sheriff's Office for the misdemeanor
charge of Failure to Appear for a Fingerprintable Offense (GC 17-6-
12).

     g.  On October 16, 2024, GRIFFIN was transferred to the
custody of the Fayette County Sheriff's Office for a misdemeanor
charge of Probation Violation (GC 42-8-38).

     h.  On October 27, 2024, GRIFFIN was transferred to the
custody of the Rockdale County Sheriff's Office for a felony charge
of Probation Violation (GC 42-8-38).  GRIFFIN was released on July
13, 2025.

      i.   On July 17, 2025, GRIFFIN was arrested by Rockdale County Sheriff's Office in Conyers, GA (RCSO Case #2594888) when approximately 303 grams of marijuana and a firearm were found in the vehicle where GRIFFIN was a passenger.  RSCO arrested the driver of the vehicle and GRIFFIN for the felony charge of Possession of Marijuana with Intent to Distribute (GC 16-13-30), the felony charge of Possession of a Schedule II Controlled Substance (GC 16-13-30), and the misdemeanor charge of Possession of Drug Related Objects (GC 16-13-32.2).  The case against GRIFFIN was dismissed on July 31, 2025 and GRIFFIN was released.

    72.  GRIFFIN's social media posts indicate that, on or about August 26, 2025, GRIFFIN traveled from Georgia to California.  On August 31, 2025, I made contact with Alisha Malcolm, Department of Community Supervision, Rockdale County, GA.  Malcolm informed me that GRIFFIN's listed address is 4280 Rue Antoinette, Stone Mountain, GA 30083, and, per the terms of GRIFFIN's probation, he requires a travel permit to leave the State of Georgia, which he did not obtain.  GRIFFIN's presence in California would therefore be a violation of his probation.

    73.  According to his criminal history and commercial databases, GRIFFIN has used multiple social security numbers. GRIFFIN disclosed to the cooperating witness in 2023 that he was aware of warrants for his arrest in Georgia.  Additionally, a review of the bodycam footage of GRIFFIN's arrest by APD on October 4, 2024, revealed that GRIFFIN was aware his driver's license was suspended, he was on probation, and he had an arrest warrant from Rockdale County.  GRIFFIN also asked the arresting officer whether the officer would have pursued had GRIFFIN not pulled over for the

traffic stop.  GRIFFIN then said, "If I would have ran, I would have told my girl just open that garage," indicating he had been considering fleeing from police and attempting to evade capture.

74.    GRIFFIN consistently indicates on social media that he is a member of the Crip street gang.  As one example, on June 7, 2024, the @treytimes3_ page on X wrote, "I'm a Crip fr not no pretender."  As recently as August 20, 2025, the @treytimes3_ page posted, "Nobody wanna talk to a crip while I get tatted yall all weirdos cuhkz."  GRIFFIN continuously uses terms known to be used by members of the gang, such as "on crip," "cuz," or "cuh."

75.    A review of the treytimes3 Instagram page showed multiple photos of GRIFFIN in the presence of guns.  In a post dated February 16, 2022, GRIFFIN can be seen with a flat dark earth colored pistol in his waistband.  In a post dated May 11, 2022, GRIFFIN can be seen standing on cases of soda in the middle of a convenience store with his hand on a black Glock pistol.  In a post dated June 3, 2022, GRIFFIN can be seen standing in a kitchen looking down towards two black pistols sitting on the counter next to his right hand.  All these gun photos were posted while GRIFFIN was on probation with a firearms restriction.

## VI. <u>TRAINING AND EXPERIENCE REGARDING MAIL THEFT AND BANK FRAUD</u>

76.    Based on my training and experience, and information obtained from other law enforcement officers who investigate bank fraud perpetrated with stolen or counterfeit checks, I know the following:

a.    Personal, business, and government checks are often stolen from the mail.  The stolen checks are then "washed"[5] or used as a template to create counterfeit checks.  These check thieves or their co-conspirators typically then recruit other individuals willing to provide access to their bank account in return for a promise of financial gain.  The recruited individuals are asked to provide their debit card and PIN, or login credentials for their online banking service, in order to deposit the fraudulent checks. As soon as the funds become available, those orchestrating the fraud ask the account holders to transfer or withdraw the majority, if not all, of the money deposited and provide it to the fraudsters.  Those who steal and alter checks, or create counterfeit checks, often maintain a network of co-conspirators who actively recruit bank account holders for this exact purpose, and much of the activity occurs via cellular communication, or over social media.  The scheme perpetrated by GRIFFIN and SANCHEZ follows this pattern, with Instagram users such as 4800_trench and livinglikeshay recruiting accountholders to accept deposits of fraudulent checks procured by GRIFFIN and SANCHEZ.

b.    Counterfeiters of checks must maintain specialized equipment and supplies to craft convincing counterfeits, such as blank check stock, acetone and other solvents for removing ink, computers, programs, scanners, cameras, and printers card for making, altering, and printing digital images of checks.  Typically,

---

[5] Check washing scams involve changing the payee names, and often the dollar amounts, on checks, then fraudulently depositing them.  Oftentimes, chemicals are used to remove the name of the payee and the amount.

criminals store such equipment and supplies where they feel it is safe and readily accessible to them, most commonly at their residence, although some may maintain either a second residence or workspace so that they can compartmentalize their activities and keep their most obviously criminal supplies outside their main residence.

      c.   Counterfeit identity documents are often used to commit identity theft.  That is, criminals purchase counterfeit identity documents so that they can impersonate particular individuals, for example to withdraw money from a bank, to negotiate a counterfeit check, or use a stolen or counterfeit credit card.

      d.   Individuals involved in identity theft and fraud schemes must keep evidence of their schemes, such as victim information and accounts used in the scheme, simply to keep the scheme going.  Much of this evidence is now stored on digital devices such as computers and smartphones.

      e.   Counterfeiters of checks have to possess at least some of the identifying information of both the payor and the payee. Typically, this information is transmitted and stored digitally.

      f.   Most criminals prefer to deal in cash, as it is untraceable.  More recently, some use cryptocurrency to store and transfer their illicit wealth.  They increasingly use peer-to-peer payment systems like Venmo or Zelle to make and receive payments, too.  Regardless of the payment method, members of criminal conspiracies must keep track of which conspirators have been paid, and how much, in order to stay in business.  Commonly this is done digitally.  Even criminals who receive their illicit funds in cash will deposit some of their cash proceeds into bank accounts, or use

30

them to purchase money orders or cryptocurrency, so they can spend the proceeds at places that do not commonly accept cash payments, such as for rent, or to store the proceeds safely.

g.    Generally, perpetrators of fraud schemes maintain the evidence described above where it is close at hand and safe, such as in their residences, automobiles, and, especially with smartphones, on their person.  For larger or more sophisticated frauds, participants often attempt to distance themselves from some of the incriminating evidence by renting public storage units or safety deposit boxes where they often keep the items for which they will not need immediate access.

h.    Members of a criminal conspiracy must communicate with one another out of necessity.  Commonly this is done by text, email, telephone, or specialty communication application, often an encrypted one such as WhatsApp, and most often by smartphone. Members of the conspiracy commonly carry their smartphones, which include the contact information for their co-conspirators, on or near their persons, such as in their cars or residences.

## VII.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[6]

77.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[6] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

know that the following electronic evidence, inter alia, is often
retrievable from digital devices:

78.   Forensic methods may uncover electronic files or remnants
of such files months or even years after the files have been
downloaded, deleted, or viewed via the Internet.  Normally, when a
person deletes a file on a computer, the data contained in the file
does not disappear; rather, the data remains on the hard drive until
overwritten by new data, which may only occur after a long period of
time.  Similarly, files viewed on the Internet are often
automatically downloaded into a temporary directory or cache that
are only overwritten as they are replaced with more recently
downloaded or viewed content and may also be recoverable months or
years later.

79.   Digital devices often contain electronic evidence related
to a crime, the device's user, or the existence of evidence in other
locations, such as, how the device has been used, what it has been
used for, who has used it, and who has been responsible for creating
or maintaining records, documents, programs, applications, and
materials on the device.  That evidence is often stored in logs and
other artifacts that are not kept in places where the user stores
files, and in places where the user may be unaware of them.  For
example, recoverable data can include evidence of deleted or edited
files; recently used tasks and processes; online nicknames and
passwords in the form of configuration data stored by browser, e-
mail, and chat programs; attachment of other devices; times the
device was in use; and file creation dates and sequence.

80.   The absence of data on a digital device may be evidence of
how the device was used, what it was used for, and who used it.  For

example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

81.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

82.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

83.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

84.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates

33

to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

85.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

86.  Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

87.  In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

88.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress the thumb and/or fingers of the Target Subjects (GRIFFIN

and SANCHEZ) on the device(s); and (2) hold the device(s) in front of those persons' faces with their eyes open to activate the facial-, iris-, and/or retina-recognition feature.

89.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.  <u>CONCLUSION</u>

90.  For the foregoing reasons, there is probable cause to believe that CHASE GRIFFIN committed violations of 18 U.S.C. §§ 1344, 1349, 1028A, (Conspiracy to Commit Bank Fraud, and Aggravated Identity Theft) in furtherance of the check fraud scheme. Additionally, there is probable cause to believe that the items listed in Attachment B will constitute or yield evidence of violations of the Subject Offenses committed by the Target Subjects, and will be found in the residences, vehicles, or on the persons of GRIFFIN and SANCHEZ, as described in Attachments A-1, A-2, A-3, A-4, A-5, and A-6.


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this  3rd  day of September, 2025.

_____
HONORABLE MICHAEL B. KAUFMAN
UNITED STATES MAGISTRATE JUDGE